Walter Glenn Bud Curry, alias, was indicted for the murder of Daniel Hughes in violation of § 13A-6-2, Code of Alabama 1975. The jury found the appellant "guilty of the offense of murder as charged in the indictment." Following a sentencing hearing and review of a pre-sentence investigation report on the appellant, he was sentenced to life imprisonment without parole and fined the sum of $10,000.
Millard Conley, a Tuscumbia City Police Officer, testified that, during the course of his investigation of the disappearance of David Hughes, he spoke with a witness named David Geise. During this interview, *Page 838 
on August 19, 1985, Geise told Conley one version of the incident involving this appellant and then changed his statement concerning the incident.
Following the interview, Conley went to the area known as "Spring Creek Bottoms" where there was a sewer manhole. There he discovered two bones beside the sewer hole. He secured the area before leaving that night. The next morning Conley went back to the area accompanied by a Mr. Gale from the Forensic Sciences Department and a member of the Colbert County, Alabama Rescue Squad. The sewer, which was stopped up and overflowing at the time, was pumped out and Mr. Gale began removing some bones from the sewer.
The Spring Creek Bottoms area is located near the Northwest Alabama Junior College off of Highway 72, south of Tuscumbia, Alabama.
Conley testified that, upon examination of David Geise's car, he discovered a hole in the rear seat.
Conley spoke with David Geise on the 19th, the 20th and the 22nd of August, 1985. Two of Geise's statements were in written form. Both were obtained on the 19th of August. Conley also interviewed Mark Cougle, another witness in the case.
Larry Joe Rainey, a friend of David Hughes, testified that he and Hughes had met each other at Rainey's aunt's house at around seven o'clock a.m. on April 22, 1985. They went fishing for several hours. After they finished fishing they went to Jerry Lunceford's house, arriving there at approximately a quarter to four. When they arrived at Lunceford's, the appellant and David Geise were there as well as Diane and Debbie Michael and two children.
Rainey testified that this was the first time that he had met the appellant, David Geise, and the others. Rainey and Hughes had both consumed about four beers each before they arrived at Lunceford's. After everyone had been drinking whiskey for a while at Lunceford's, the appellant, Geise, and Hughes left to purchase more whiskey. Rainey waited for approximately an hour for the three to return. He was then picked up and taken home by his uncle. He went to Lunceford's house the next day. Hughes' car was still there so they took it to Hughes' mother's house.
Rainey testified that, while he was in their presence, there was some conflict between Hughes and the appellant. They were arguing about who was the "toughest". When the trio left around 4 o'clock to purchase the whiskey, Hughes was wearing white tennis shorts and a black sleeveless tee shirt. They left in David Geise's car.
Rainey was out of jail on the SIR program on the day in question. At the time of trial he had been convicted of at least four felonies and was in prison.
David Geise testified that he was living next door to the appellant's brother and parents on Monday, April 22, 1985. On that date, Geise had injured his back while at work, been treated by a doctor, and had then gone home.
Geise went next door to the appellant's brother's house. While he was there he and the appellant got into a fight during which Geise's glasses were broken. Geise then went home. Soon thereafter, the appellant came over to the Geise's house and asked Geise to take him to the liquor store. They left in Geise's yellow Capri automobile around two o'clock.
After purchasing the liquor, the appellant asked Geise to take him to Jerry Lunceford's house. While they were there David Hughes arrived with a boy who was crippled. Geise stayed at Lunceford's house approximately one hour. During that time everyone was drinking whiskey and the appellant and Hughes were discussing a "tough man contest" and "the service". Hughes, Geise and the appellant then left for the package store in Geise's Capri automobile.
When they left, the appellant was sitting on the passenger's side of the automobile; Geise was driving the car and Hughes was sitting in the back seat behind Geise on the driver's side. *Page 839 
During the drive to the liquor store the appellant and Hughes were arguing about "who was the biggest and who was the baddest". When they arrived at the liquor store, the appellant went in to purchase the liquor while the others stayed in the car. The appellant purchased another bottle of whiskey.
After the appellant returned to the car he told Geise to "ride around for a minute". Geise testified that he had planned on going back to Lunceford's house.
The conversation about "who was the biggest and who was the baddest" continued as Geise drove toward the area previously described as "Spring Creek Bottoms" as directed by the appellant. Hughes and the appellant indicated that they "would find out" who was the biggest and the baddest. When they arrived at the area previously described, the appellant said that he was going to kill Hughes. Geise tried to dissuade the appellant and then got out of the car.
While the appellant was still in the car with Hughes, he shot him with his own gun which was a .22 or .25 caliber pistol. Hughes and the appellant then both got out of the car and the appellant asked Geise for Geise's gun which was a .32 caliber and was under the seat of the car. Geise gave the appellant his gun and appellant then shot Hughes again with Geise's gun "about four or five times". The appellant told Geise that "if [he] said anything he'd get [him], too."
After the shooting incident, Geise and the appellant went back to the apartment. The appellant then returned the gun to Geise.
Geise went to his parents' house following his return. He stayed there for about 15 minutes, then went back to the apartment and lay down. Geise did not know where the appellant went. There was no one at the Geise's apartment when he returned.
Later, Geise's wife returned, and then approximately 30 minutes later the appellant came by and asked Geise to help him move Hughes' body. The appellant discussed this with Geise out of the presence of Geise's wife (just outside the front door).
Geise agreed to go with the appellant. Mark Cougle was with the appellant at the time. The three drove back to Spring Creek Bottoms in Cougle's car. When they arrived the body was lying on the ground and it was dark outside. While Cougle held a flashlight, the appellant and Geise moved the body into the manhole.
In August, 1985, Geise turned his gun over to Millard Conley.
Geise first spoke to the police on the night of the shooting. At that time Geise told them that they had dropped Hughes off at an underpass. The appellant instructed Geise to give this story following the shooting incident.
The next time that Geise was questioned by the police was approximately two weeks later. Geise gave the police the same version of the incident. He did not give the "true" version of the incident to the police until after his baby was born.
Geise did not mention placing the body in the manhole nor Mark Cougle's involvement until later sessions with the police because he was afraid the appellant would harm him or his family.
Mark Cougle, a friend of the appellant's brother, testified that he knew who the appellant and David Geise were prior to the day in question but did not know them well.
Cougle saw the appellant with David Geise on April 22, when they came to the appellant's house around 3 o'clock p.m. This was the first time that Cougle had seen either of them that day. Before they arrived he had been watching television there with the appellant's brother. Both Geise and the appellant had been drinking, but Geise was not as intoxicated as the appellant was at that time. The appellant and Geise began wrestling while they were there, during which time David Geise's glasses were broken. Geise then went home. *Page 840 
A few minutes later, the appellant went next door to apologize to Geise. Then the appellant came back and told Cougle that he and Geise were going to the liquor store. The two left the apartment at approximately four o'clock and returned approximately one hour later. At that time they appeared more intoxicated than before and Geise seemed "upset". Soon thereafter, Geise's wife returned home from work and Geise went home.
The appellant and his brother got into a fight during which the appellant threatened to kill him. While the appellant was distracted, Cougle and the appellant's brother held the appellant down and searched him. They removed his gun (a .22 caliber revolver). Cougle had traded this gun to the appellant three days before in exchange for a shotgun.
The appellant's brother left the apartment and Cougle had started to leave when the appellant stopped Cougle and "told [him] he wanted [him] to take him somewhere". Cougle said he would because he was afraid of the appellant.
The appellant then went to Geise's apartment and got Geise. The three drove in Cougle's car to a place where a body was located. Geise and the appellant put the body in a "drainage hole". Before they dropped the body down the hole the appellant took a wallet from the pocket of the deceased person and looked in it. There was no money in the wallet and the appellant said, "damn, the son of a bitch didn't even have any money". Cougle searched for a whiskey bottle that had been left at the scene earlier and gave it to the appellant before they left. The appellant broke the bottle later on the highway as they were leaving.
The first time that Cougle spoke with the police about the incident was in August. He did not report the incident earlier because he was afraid of the appellant.
Dr. Eugene Scheuerman testified that he received a black, sleeveless tee shirt, light white or tan shorts, underwear, white socks, a black comb, a fishing bobber and a cigarette pack. He also conducted an examination of the bones recovered from the scene and stated that he believed the cause of death of the victim was multiple gunshot wounds.
Based upon examination of the dental records of David Hughes and the skeletal remains, Dr. Scheuerman and a Dr. John Hoar concluded that the skeletal remains found at the scene were those of David Hughes.
Brent Wheeler of the Alabama Department of Forensic Sciences testified that the bullets he received from Dr. Scheuerman which bad been removed from the body had come from two different guns. He identified two .32 caliber bullets and three .25 caliber bullets and one bullet hole in the rear of Geise's car.
Sherry Arthur, the appellant's girlfriend at the time of the incident, testified that she was with the appellant from approximately one o'clock p.m. on April 22, 1985 until the next morning.
David Geise's wife testified as a rebuttal witness for the State and verified that the appellant came to her apartment at approximately 7 o'clock on April 22, 1985, to speak to her husband and then left with him. She saw Mark Cougle with the appellant at that time.
Libby Riner, the clerk at the package store, mentioned previously on the date in question, verified that the appellant came into the store and purchased a bottle of liquor on that date at approximately 3:30 or 4:00 p.m. She testified that two people were waiting in the car at the time and that one of them was David Geise.
 I
The appellant contends that the trial court's actions in handling his motion for pre-trial discovery constituted reversible error. He bases his argument on several different legal and factual arguments, none of which we find meritorious.
Appellant argues that the State failed to provide the appellant with the "inconsistent" statements made by David *Page 841 
Geise prior to trial as opposed to providing them during trial. The appellant relies on the Brady doctrine in support of this argument. We need not analyze this issue under the Brady
doctrine, however. We do not believe that, in this case, "the error complained of has probably injuriously affected substantial rights of the parties". A.R.A.P. 45. Not only was the appellant given the actual statements themselves during the trial (R. 71), but he was also made aware of the inconsistent statements made by Geise before trial, during the hearing on the discovery motion. (R. 7). In fact, a fairly lengthy discussion was had concerning these statements. (R. 7-9).
Furthermore, had a Brady analysis been necessary, we do not believe that the appellant could have made the requisite showing essential to a claim under Brady. See United States v.Walker, 720 F.2d 1527 (11th Cir. 1983), cert. denied, Gustin v.United States, 465 U.S. 1108, 104 S.Ct. 1614, 80 L.Ed.2d 143
(1984); Killough v. State, 438 So.2d 311 (Ala.Crim.App. 1982), rev'd on other grounds, 438 So.2d 333 (Ala. 1983), on remand 438 So.2d 336 (Ala.Crim.App.), and cases cited therein.
The appellant also contends that he was erroneously denied pre-trial discovery of a list of witnesses intended to be called by the State. He cites A.Temp.R.Crim.P. 18.1(c) in support of this argument. The appellant's reliance on Rule 18.1(c) is misplaced.
The appellant argues, in essence, that he does not seek the tangible "list" itself, but only the facts, i.e., the names of the witnesses. As the subtitle indicates, the section referred to applies only to "Documents and Tangible Objects". A.Temp.R.Crim.P. 18.1(c).
Even assuming the rule to be applicable, we do not believe it requires that the State produce this information. On the contrary, subsection (c)(1) of the Rule is more in the nature of a protective device. The subsection reads: "[H]owever, the defendant shall not be permitted to discover or inspect reports . . . witness lists . . . made by the district attorney or his agents . . . in connection with the investigation or prosecution of the case . . ." (Emphasis added) A.Temp.R.Crim.R. 18.1(c)(1).
 "[T]he accused in a criminal case has no inherent right to the inspection or disclosure of evidence in the possession of the prosecution. Whether to grant or deny an accused the right to inspect evidence in the possession of the prosecution lies within the discretion of the trial court."
C. Gamble, McElroy's Alabama Evidence, § 290.05(1) (3rd ed. 1977). See Killough, supra. We find, therefore, no abuse of discretion in connection with the trial court's handling of these discovery matters.
 II
The appellant contends that the admission of David Geise's testimony was reversible error and should have been excluded as a matter of law because Geise was an accomplice to murder with the scope of § 12-21-222, Code of Alabama 1975. This contention is without merit.
Section 12-21-222, Code of Alabama 1975 provides that "[A] conviction of felony cannot be had on the testimony of an accomplice unless corroborated by other evidence tending to connect the defendant with the commission of the offense. . . ."
It is clear from the facts of this case that it wouldnot have been proper, as the appellant argues, for the trial court to have held as a matter of law that Geise was an accomplice, and to have stricken his testimony from the consideration of the jury.
 "Whether a witness is an accomplice may be a question of law or fact, depending on the circumstances. Doss v. State, 220 Ala. 30, 123 So. 231 (1929). However, the question of complicity is usually a question of fact; it becomes a question of law only where the court is clearly convinced by a preponderance of the evidence that the witness could have been indicted and convicted of the same charge of a felony for which the defendant is on trial and that the witness freely participated in the crime. Where there is *Page 842 
no conflict in the testimony, the question of whether a witness is an accomplice is a question of law for determination by the trial court. Pryor v. State, 47 Ala. App. 706, 260 So.2d 614
(1972).
". . .
 "Thus, where there is doubt or dispute whether a witness is in fact an accomplice, the question is for the jury and not the trial court. Skumro v. State, 234 Ala. 4, 170 So. 776 (1936). Where there is doubt whether a witness is in fact an accomplice, and the testimony is susceptible to different inferences on that point, that question is for the jury. Sweeny v. State, 25 Ala. App. 220, 143 So. 586 (1932); Horn v. State, 15 Ala. App. 213, 2 So. 768 (1916)."
Jacks v. State, 364 So.2d 397, 403 (Ala.Crim.App.), cert. denied, 364 So.2d 406 (Ala. 1978).
At most, the issue of Geise's complicity was in dispute. Indeed, the record does not reveal any attempt on the part of the appellant to carry his burden of proving that Geise was an accomplice. Jacks, supra p. 403.
The facts in this case fail to establish that Geise was an accomplice. The testimony showed that Geise was motivated by fear of the appellant when he drove to the scene of the crime, gave the appellant his gun, and later returned to the scene at the appellant's direction. The appellant produced no evidence which established Geise as an active participant in the shooting.
For the reasons stated above, we find no error concerning the admission of Geise's testimony.
 III
The appellant contends that the trial court erred by failing to exclude from the courtroom the wife of the State's chief witness after "the rule" had been invoked and, later, allowing her to testify on the State's behalf. He argues that the witness' subsequent testimony was influenced by that given previously by other witnesses. We disagree.
"The general rule in Alabama is that the invocation and enforcement of the rule of exclusion of witnesses is a matter within the sound discretion of the trial court and is not normally subject to appellate review." (Citations omitted).Chatman v. State, 380 So.2d 351 (Ala.Crim.App. 1980). SeeYoung v. State, 416 So.2d 1109 (Ala.Crim.App. 1982); Chessonv. State, 435 So.2d 177, 179 (Ala.Crim.App. 1983); Partridgev. State, 431 So.2d 1377, 1379 (Ala.Crim.App. 1983). See alsoFaircloth v. State, 471 So.2d 485 (Ala.Crim.App. 1984), aff'd, 471 So.2d 493 (Ala. 1985); Cowgill v. State,426 So.2d 517 (Ala.Crim.App. 1982).
Nevertheless, we have reviewed the actions of the trial judge and now hold that he did not abuse his discretion in admitting the testimony of this "unsequestered" witness. At the time the appellant moved to have the witness excluded from the courtroom neither party had issued a subpoena for the witness. (R. 50). Furthermore, the appellant offered no factual proof that the witness' testimony had been influenced by the other witnesses' testimony and any bias or "influence" surrounding her testimony could have been (and to some extent was) brought out on cross-examination. (R. 194-198). See Chatman, supra; Young, supra.
 IV
The appellant contends that the court committed reversible error when it failed to grant the appellant's motion for directed verdict on the grounds that, without the testimony of the "accomplices" in this case, the evidence was insufficient to support the jury's verdict. We do not agree, especially in light of our decision in part II of this opinion.
We, therefore, conclude that the jury might have reasonably found "that the evidence excluded every reasonable hypothesis except that of guilt." Cumbo v. State, 368 So.2d 871
(Ala.Crim.App. 1978), writ denied, 368 So.2d 877 (Ala. 1979). Even assuming that Geise was an accomplice, the facts in this case convince us that there was sufficient corroboration of his testimony. *Page 843 Jacks v. State, 364 So.2d 397 (Ala.Crim.App.), cert. denied,364 So.2d 406 (Ala. 1978).
 V
The appellant asserts as reversible error the court's denial of his mistrial motion based on the trial judge's mishandling of an incident during trial involving an outburst by one of the appellant's witnesses.
The record reveals that during the cross-examination testimony of Mrs. Geise, Sherry Arthur, who had previously testified as an alibi witness for the appellant and had been dismissed, burst out "that's a lie, I was with him. . . ." (R. 194-195). She was then placed in custody and removed from the courtroom after direction of the trial judge. The jury was then excused. When the jury returned to the courtroom the judge gave them the following instructions:
 "BY THE COURT: Ladies and gentlemen of the jury, when you were in here last, there was an outburst in the courtroom by one of the witnesses in this case, Miss Sherry Arthur. You are to disregard anything that she said or did at this time when you go into the jury room to deliberate in this case. Please wipe it from your memory, it didn't happen, you are to disregard it. I hope you understand my instructions to you. You should not even consider it, and we will go on with the testimony at this time." (R. 196).
 "[T]he granting of a mistrial is within the sound discretion of the trial court, for he, being present, is in a much better position to determine what effect, if any, some occurrence may have upon the jury's ability to decide the defendant's fate fairly and justly. And we will not interfere with the trial judge unless there has been a clear abuse of discretion."
Shadle v. State, 280 Ala. 379, 194 So.2d 538 (Ala. 1967).Retowsky v. State, 333 So.2d 193 (Ala.Crim.App. 1976).
In light of the trial judge's curative instructions, we hold that he committed no abuse of discretion in his denial of the appellant's motion for mistrial. His instructions removed any possible prejudicial effect of the outburst on the jury.
His action in having the witness removed from the courtroom while the jury was present can certainly be justified by the facts of this case. See Hall v. State, 377 So.2d 1123
(Ala.Crim.App.), writ denied, 377 So.2d 1128 (Ala. 1979); Young v.State, 416 So.2d 1109 (Ala.Crim.App. 1982).
Furthermore, it is at least arguable that this incident operated to enhance the credibility of the witness' previous alibi testimony. It is quite possible that the jury could have considered the emotional nature of the outburst as indicative of its truth, thus reducing the possibility of prejudice.
In short, we do not believe the "high degree" of "manifest necessity" required for the granting of a mistrial has been shown. Woods v. State, 367 So.2d 982 (Ala. 1978).
We have examined each error alleged by the appellant in brief. Having found no error, this cause is due to be and is, hereby, affirmed.
AFFIRMED.
All the Judges concur.