Gary Leon Brown was indicted for the capital offense of the murder of Jack McGraw during a robbery in violation of §13A-5-40(a)(2), Code of Alabama 1975. The jury found the appellant "guilty of capital murder as charged in the indictment". After the punishment phase of the trial the jury returned an advisory verdict for death by a vote of ten "for death" and two "for life without parole". At the sentencing hearing the trial judge upheld the jury's advisory verdict by sentencing the appellant to death by electrocution.
Walter James, Jr., cousin of the victim, testified that he last saw the victim in December of 1985. James at that time did not notice any physical ailments or obvious physical deformities to the victim.
Chris Mitchell, a 13 year old, stated that when he knocked on the victim's door he saw the victim lying face down inside his trailer near the door. Mitchell and the three boys that he had been playing with went to Johnny Harris' house and told his parents.
James Harris, father of Johnny Harris, and two of his neighbors then went to the victim's trailer. Harris testified that they did not disturb anything but just looked through the glass door and saw the victim's body. Harris called the sheriff's department.
Harris stated that the victim's trailer was located in Pinson, Alabama.
Two officers of the Jefferson County Sheriff's Department testified as to securing the crime scene at the trailer and then turning it over to Ted Williams, evidence technician, without the same being disturbed except for one officer checking to make sure the victim was dead.
Ted Williams photographed and sketched the scene. Williams identified numerous exhibits which he had collected from the victim's residence.
Sgt. Don Gaskey of the Jefferson County Sheriff's Department stated that on May 30, 1986, he went to the home of Blanche Bankhead. From the backyard of the Bankhead residence Gaskey collected pieces of clothing from an area that appeared to have been burned.
Witnesses who handled the chain of possession and who also tested certain items of evidence testified accordingly.
Steve Dexler, a trace analyst with the Alabama Department of Forensic Sciences, examined burned materials found in the backyard of the Bankhead home. Three portions of the burned material were "consistent with material coming from clothing." (R. 499) Two metal fragments were "consistent with speed-lacing eyelets off of footwear." (R. 500)
Dr. Robert Brissie, chief coroner and medical examiner for Jefferson County, performed the autopsy on the victim. Dr. Brissie found several stab wounds to the *Page 109 
head and a contusion to the back of the victim's head. Dr. Brissie's opinion was that there were "at least fifteen or sixteen cuts" to the neck including those that "cut down through the carotid artery and the jugular venous complex." (R. 522, 523) On examining the victim's back from the base of the neck downward to the base of the shoulder blades 59 stab wounds were found by Dr. Brissie. "Many of these stab wounds were notched, an appearance most consistent with a suspect weapon having its position altered or twisted at the time of stabbing." (R. 528) Several areas of the victim's body were bruised. In Dr. Brissie's opinion death was caused by bleeding to death from the stab wounds.
Jimmy Davenport testified that on May 26, 1986, he went fishing with his brother-in-law, James Bynum, Archie Bankhead and the appellant. While fishing, they were drinking beer and whiskey. All four men then went to Chuck and Willie's Lounge to play pool and drink. The four men left the lounge together with Davenport doing the driving.
Davenport stated that he heard them say "something about going and killing a queer, or something like that." (R. 567) They (Bankhead and the appellant) both were asking Bynum:
 " 'How hard can you hit?' And, you know, James was saying, 'Pretty hard.' And I guess — I think Gary asked him, 'Well, can you knock this old man out?' And James said, 'yes', he could. And then Gary said, 'Well, if you can't, I can', or something like that. And that's about it." (R. 570)
Bynum gave Davenport directions to the victim's trailer. Bynum, Bankhead and the appellant went up to the victim's trailer and knocked on the door. The victim opened the door and let them come inside. A short time later all four came back outside the trailer. Bankhead grabbed the victim around the neck in a "headlock". Bynum and the appellant were hitting the victim. (R. 571) Bankhead, Bynum and the appellant picked the victim up and carried him inside the trailer. Davenport observed this while sitting in his car.
Davenport did not see the victim after the altercation. When Bynum, Bankhead and the appellant came out of the trailer, they were carrying items. Davenport observed blood on all three men. The back seat was so full of items from the victim's trailer that the appellant rode in the trunk to Bankhead's house.
The stolen items were taken into Bankhead's residence. Davenport could not remember vel non if he helped carry the items into the house.
Davenport testified that Bankhead gathered all four of their shirts, the appellant's pants and Bankhead's pants and burned them in the backyard. The reason for burning the clothing was that it had blood on it. Davenport stated that he had blood on the shoulder of his shirt because Bankhead had brushed Davenport's shirt when he got into Davenport's automobile.
A wallet was seen by Davenport in Bankhead's kitchen. Davenport received some of the money which the wallet contained.
On cross-examination Davenport admitted that he had not told the grand jury about seeing the wallet in question, Bankhead's burning Davenport's shirt, or statements made by the three men on the way to the victim's house.
The day before the jury for this trial was struck, Davenport talked with Mr. Anderton and Mr. McGregor, assistant district attorneys. After being asked several times, Davenport admitted overhearing statements made on the way to the victim's trailer. Davenport indicated that Anderton had told him that a case could be made against Davenport, but right now they were not going to charge Davenport with any crime.
Davenport stated that no conversation took place at Bankhead's house because they did not want Bankhead's wife to overhear them.
After cross-examination the prosecution made a motion to require that the taped interview between the prosecutors and Davenport be played for the jury. The reason for this was that the tape would be played instead of rehabilitative testimony, *Page 110 
due to the fact that there had not been a typed transcript made of this taped interview. The trial judge gave instructions to the jury that the reason he was allowing the tape to be played was to let the jury determine the circumstances under which Davenport gave this changed testimony and the credibility to give to Davenport as a witness.
Blanche Bankhead stated that in May of 1986, she was married to Archie Bankhead. On the night of May 26, 1986, her husband, Davenport, Bynum and the appellant came to the Bankhead home. Her husband, Davenport, and the appellant had blood on all of their clothes and arms and Bynum had blood on his shirt.
A microwave oven, a television and a stereo with speakers were brought into her home by Bynum, Davenport, Archie Bankhead and this appellant, Brown.
Blanche then went into the bedroom and overheard the following conversation:
"Archie said, 'Are you sure he's dead?
Are you sure you killed him, Gary?'
 "Response was, 'I kept stabbing and stabbing and stabbing and stabbing.' Archie again said, 'Yes, but are you sure he's dead?' and Gary said, 'No, because then when we was getting the stuff out, he began to get up.' And Bantum [sic] [Bynum] had said 'Archie handed the butcher knife to me said we have to kill him.' . . . he said he [Bynum] 'sliced his throat.' " (R. 651-652) Davenport then said, "I can't believe y'all done this. I've got to get out of here. Get the stuff out of my car." (R. 652)
Blanche testified that she then heard them look for money in a wallet and split the "sixty something dollars" they found in this wallet. (R. 653) Archie later said, "We've got to take all our clothes off, we've got to burn them. We'll go burn them outside, even our shoes." (R. 654)
The appellant, Brown, then went to a local store and bought some beer.
When the men were in the back yard with the fire, Blanche saw Archie's pocket knife in a pan of water on the stove. Blanche later found this knife behind the stove and turned it over to Sgt. White.
Later that night Blanche overheard her husband and the appellant loading stuff in a car and leaving.
On cross-examination Blanche admitted that in the statement she gave the police on May 29, 1986, the only conversation which she stated she overheard was concerning the burning of something. As to several other details in her May 29 statement, Blanche testified such must have been typed incorrectly.
Sgt. Eddie White, detective for the Jefferson County Sheriff's Department, stated that a knife and an iron skillet were found in the victim's kitchen sink. The bottom of the skillet was missing. An antenna wire was hanging from the den ceiling and had been cut.
On May 29, 1986, Sgt. White first talked with this appellant. At the Center Point Sheriff's Office, Sgt. White recorded his questioning of the appellant. The appellant was advised of his constitutional rights both verbally and in writing before any questioning began. Sgt. White read most of the transcript of this taped session for the jury.
In the first statement given by the appellant on May 29, 1986, he stated that on May 16, 1986, he and Bynum went to the victim's trailer and they stole a VCR and some checks. Bynum then cashed two or three checks from the victim's checkbook. The appellant stated that this was the last time he had been to the victim's residence.
On May 26, 1986, the appellant, Brown, told Sgt. White that, together with Archie Bankhead, Davenport, and Bynum, he went to Chuck and Willie's Lounge around 6:30 p.m. and stayed approximately two hours. After leaving the lounge they went over to Bankhead's house to watch television.
After making his statement, the appellant then directed the police to the place where Bynum was living. Bynum then made a statement to the police.
Upon returning to the Center Point Sheriff's Office that night, the appellant gave *Page 111 
another statement. This statement was played for the jury.
In this second statement the appellant admitted going to the victim's trailer on May 26, 1986. Davenport had stayed in the car while Bynum, Bankhead and the appellant, Brown, went into the victim's residence. A short time later four men, including the victim, McGraw, came outside the trailer. As they were walking, Bankhead grabbed the victim around the neck and choked the victim until he passed out. The appellant stated that Bynum and Bankhead then carried the victim inside the trailer. Bankhead told them they could not let the victim live because he could identify them. Bankhead took out his pocket knife and stabbed the victim a few times in the back. The appellant, Brown, did not see Bankhead cut the victim's throat. From the victim's residence Bankhead, Bynum and the appellant then stole some beer, two television sets, two stereos, a microwave, a checkbook and a wallet. A towel was used to wipe off their fingerprints. The appellant got into the trunk of Davenport's vehicle because the back seat was full of stolen items.
At Bankhead's house all the stolen items were taken into the house. The victim's checkbook and wallet and the four men's outer clothing were then burned in Bankhead's backyard.
Davenport and Bynum left after splitting up the money found in the wallet. Bankhead and the appellant, Brown, later loaded up the stolen items and stored them at someone else's house overnight.
The appellant said the reason he did not remember things that clearly was because he was drunk.
A third statement from the appellant was given July 17, 1986, in the Jefferson County, Alabama Jail. The reason a third statement was taken from the appellant was that the appellant asked his mother to contact the police and have someone come talk to him concerning this case. The appellant did not request that his attorney be present. The tape recording of this statement was also played for the jury.
The appellant in this statement said that Bynum had suggested that they go to the victim's trailer and steal some things. Davenport stayed in his automobile while Bankhead, Bynum and the appellant, Brown, went into the victim's trailer. When they started to leave the trailer, Bankhead grabbed the victim from behind and choked the victim while Bynum was hitting the victim in the face. After they dragged the victim inside the trailer, the victim made a moaning sound. Bankhead told the appellant that they had to kill the victim. Bankhead handed the appellant a brown pocket knife with a three inch blade. Bankhead went into the kitchen and returned with a large object which the appellant later found was an iron skillet. Bankhead told the appellant that he had to kill the victim. The appellant jumped on the victim's back and started stabbing him. The appellant stated that he was afraid of what Bankhead might do to him. The appellant admitted to stabbing the victim "quite a few times". Bankhead said the pocket knife was not going to get it and hit the victim in the head with the iron skillet. Bynum then said he would get the victim and cut the victim's throat with a butcher knife from the victim's kitchen. All three men carried items from the victim's residence to Davenport's vehicle.
Bankhead, Bynum and the appellant pulled off their shirts and pants and burned them in Bankhead's backyard.
At this point the State rested its case.
The appellant called Archie Bankhead to testify but he refused to do so. The appellant offered no other evidence.
At the sentencing hearing, after the jury returned a verdict of guilty of capital murder, the prosecution called Sgt. White again to identify two pictures. One picture depicted the ground outside the victim's trailer and showed several areas of blood on the ground. The other picture showed how Sgt. White first observed the victim lying face down in a large area of blood, just to the left of the entrance of the trailer.
On cross-examination Sgt. White stated that the appellant "indicated to me that he realized that he had committed a very heinous *Page 112 
crime . . . and he was regretful of that." (R. 972)
Dr. Brissie testified that all stab wounds to the head, neck and back were ante-mortem wounds which would have caused tremendous pain if the victim were conscious. Seventeen pictures showing the victim's wounds and bruises were admitted as evidence during Dr. Brissie's testimony. Also slides were shown to the jury showing the wounds and bruises on the victim. Dr. Brissie stated that, if a person is unconscious and still has brain function, he would usually react to pain.
The appellant called several witnesses who testified to the appellant's good character.
The jury, by a ten-to-two vote, recommended death. Following further proceedings before the trial court, the trial judge found two aggravating and no mitigating circumstances. After the sentencing hearing, the trial judge upheld the jury's advisory verdict and fixed punishment at death by electrocution.
 I
The appellant contends that the trial court erred in denying the motion by counsel to suppress the statements made by this appellant.
First, the appellant asserts that the statements were improperly induced and, therefore, not voluntary because Sgt. Harris stated to the appellant during the three conversations that: "Oh, I am sure I told him it would be a lot better for him if he went ahead and leveled with us, but I didn't make him no [sic] promises to get him out of anything." (R. 119) It is unclear from the record exactly when this statement by Sgt. Harris was made to this appellant.
In Eakes v. State, 387 So.2d 855, 859 (Ala.Cr.App. 1978) this court stated:
 "[a] promise or inducement for a confession cannot be implied from an exhortation to a prisoner that it is best or better to tell the truth."
See also Ellis v. State, 398 So.2d 402 (Ala.Cr.App. 1981);Wallace v. State, 290 Ala. 201, 275 So.2d 634 (1973).
Sgt. Harris' remarks were to convey the thought that he would tell the truth. These remarks do not imply a promise or inducement to confess.
Secondly, the appellant's counsel argues that the appellant's statement on July 17, 1986, should have been suppressed because the appellant's right to an attorney was violated.
The appellant's counsel had been appointed on June 17, 1986, and this counsel had also been to the jail and talked with the appellant.
Sgt. Harris testified, on voir dire and outside the presence of the jury, that the appellant's mother on July 17, 1986, had contacted him and stated that the appellant wanted to make another statement. At the suppression hearing Sgt. White testified that Sgt. Brown told him that the appellant's mother had called Harris and informed Harris that the appellant wanted to make another statement. As a result of that request, White went to the jail and read the appellant his Miranda rights before taking this statement. The appellant indicated that he understood those rights, and the appellant signed the Miranda
rights waiver form. This form was admitted as evidence. White testified that he made no threats or promises or other inducements to the appellant and no violence or coercion was applied. White acknowledged that he made no attempt to find out if the appellant had an attorney prior to taking this statement. During cross-examination White stated that, "if he [the appellant] had requested that you be there, I would have notified you [appellant's counsel]". (R. 835)
 "The fact that a defendant has an attorney does not mean, as a per se rule, that law enforcement officials cannot procure a statement of any kind from the defendant without prior notice to, if not the consent of, the attorney."
* * * * * *
 "There being no per se or technical violation by not having the retained or appointed *Page 113 
counsel of an accused present during an interrogation prior to indictment, we must resolve the question of the possibility of any constitutional violation by looking to the facts of each particular case."
Thompson v. State, 347 So.2d 1371, 1376 (Ala.Cr.App. 1977), writ. denied, 434 U.S. 1018, 98 S.Ct. 740, 54 L.Ed.2d 765
(1978).
Because there was no per se violation in this cause, the issue becomes whether vel non the appellant knowingly, willingly and understandingly waived his right to counsel. We have carefully reviewed the record and considered the following factors:
(1) the appellant's counsel had talked with the appellant before he gave his third statement on July 17, 1986;
(2) the taking of the statement was initiated by the appellant, through his mother contacting Sgt. Harris;
(3) the appellant was advised of his Miranda rights before the statement was taken;
(4) the appellant acknowledged he understood hisMiranda rights and signed rights waiver form;
(5) undisputed testimony that no violence or coercion was applied to the appellant;
(6) undisputed testimony that Sgt. White made no threats or promises or other inducement to the appellant prior to taking the statement from the appellant.
Upon review of these facts, we are convinced that the appellant knowingly, willingly and understandingly waived his right to have counsel present during this statement on July 17, 1986.
Therefore, having reviewed the entire record, this court holds that the trial court properly denied the motion to suppress the statements made by this appellant.
 II
The appellant's counsel maintains that the trial court erred in denying the appellant's motion for a mistrial based upon the admission of the appellant's statement which contained evidence of another crime.
The first statement which the appellant gave on May 29, 1986, was read to the jury with parts of the statement being omitted. On a prior occasion, Bynum and the appellant had stolen the victim's VCR and some checks. This information was volunteered by the appellant when Sgt. White was questioning the appellant concerning how the appellant knew the victim, McGraw, and when he had last seen the victim.
In Sims v. State, 253 Ala. 666, 669, 46 So.2d 564 (1950), the court states:
 "[A] good statement of the rule is that if the confession indicates that accused has committed a separate offense it should be excluded by the court if its separation is possible, leaving the balance intelligible, unless it tends directly to prove accused guilty of the crime charged, or the motive for its commission, or where such part tends to explain the remaining portion of the confession." (citations omitted) (emphasis added)
See C. Gamble, McElroy's Alabama Evidence § 12.02 (3d.ed. 1977).
In the first confession of this appellant, the part mentioning the prior crime explained how the appellant knew the victim and how the appellant knew where the victim lived. The deletion of the prior crime was not possible because it would have made this part of the confession out of context and difficult to understand.
The trial court did not err in denying the appellant's motion for a mistrial based upon the admission of this statement by the appellant.
 III
The appellant's counsel argues that the trial court erred in admitting a taped interview of Davenport which was not shown to be voluntary.
In essence, the appellant is trying to assert Davenport's Fifth Amendment and Miranda rights.
 "[T]he Fifth Amendment privilege against compulsory self-incrimination, being personal to the defendant, does not extend to the testimony or statements of third parties called as witnesses at trial. *Page 114 United States v. Nobles, 422 U.S. 225, 234, 95 S.Ct. 2160, 2168, 45 L.Ed.2d 141 (1975). The Fifth Amendment privilege is a personal privilege: it adheres basically to the person, not to information that may incriminate him. Nobles, 422 U.S. at 233, 95 S.Ct. at 2167. In any event, the Fifth Amendment privilege against compulsory self-incrimination provides no protection for the commission of perjury. United States v. Apfelbaum, 445 U.S. 115, 100 S.Ct. 948, 63 L.Ed.2d 250 (1980)."
Moulds v. State, 426 So.2d 942, 948 (Ala.Cr.App. 1982).
This argument fails due to the fact that the appellant has no standing to assert a third party's rights.
Hence, the trial court did not err in admitting the taped interview of Davenport as to its voluntariness.
 IV
The appellant contends that the trial court erred in refusing to allow the appellant to play all of Davenport's interview once part of it had been played.
After playing most of Davenport's interview the following occurred:
 "THE COURT: Let me make a suggestion: The purpose in allowing this to be played has been well accomplished. Let's get down to questions and answers.
 "MR. McDONALD: They entered — I think the entire thing ought to be —
 "MR. McGREGOR: Whatever please the Court and Mr. McDonald.
"THE COURT: You want the rest of it played?
 "MR. McDONALD: Well, if they are going to put part of it in, I want to hear this sales pitch.
 "MR. ANDERTON: I don't know, Judge. I don't remember. I think we are winding down, but I can't give you a time.
 "THE COURT: Go on with your questions. And if Rusty [the appellant's counsel] wants to play the balance in his examination, he can. Let's get back to questions." (R. 627-28) (emphasis added)
After this the appellant's counsel did not request that the rest of the tape be played. If any error occurred in not playing the entire tape during the redirect examination, this was waived when the appellant's counsel chose not to request that the remainder of the tape be played. See Rule 45, A.R.A.P.
Therefore, the appellant's contention that there was a refusal to play the entire tape is unfounded.
 V
The appellant argues that the trial court erred in refusing to grant the appellant's motion for a mistrial or a continuance due to the fact that the taped interview with Davenport was not disclosed until the morning on which the trial started.
The appellant asserts that the assistant district attorneys violated A.R.Crim.P.Temp. Rule 18 and the trial court's order concerning discovery by their failure to turn over to appellant's counsel the tape recorded interview with Davenport.
Davenport had moved to Texas several months before this case came to trial. On February 8, 1987, Davenport returned to Alabama to testify. On February 8, a Sunday afternoon, the two assistant district attorneys taped an interview which they conducted with Davenport. Davenport, during this interview, made some changes as to what happened on the night of the killing of McGraw from his previous statements and testimony. On February 9 the assistant district attorneys notified appellant's attorney of these changes in the story.
Based on these facts, the prosecutors promptly notified the opposing counsel of the additional evidence as required by A.R.Crim.P.Tem. 18.3.
The appellant's argument is based on Young v. State,494 So.2d 862 (Ala.Cr.App.), cert. denied, 494 So.2d 862
(Ala. 1986). In that case the defense counsel did not learn of the additional statement made by the defendant until the police officer *Page 115 
actually testified at trial even though the prosecutor knew about the statement prior to that time.
In this case the prosecutors informed appellant's counsel the morning after receiving the changes in Davenport's story. The trial judge delayed appellant's counsel's cross examination of Davenport until appellant's counsel had sufficient time to listen to the taped interview.
 "A motion for a continuance in a criminal case is addressed to the sound discretion of the trial court, the exercise of which will not be disturbed unless clearly abused."
Fletcher v. State, 291 Ala. 67, 68, 277 So.2d 882 (1973).
 "[T]he granting of a mistrial is within the sound discretion of the trial court, for he, being present, is in a much better position to determine what effect, if any, some occurrence may have upon the jury's ability to decide the defendant's fate fairly and justly. And we will not interfere with the trial judge unless there has been a clear abuse of discretion."
Curry v. State, 502 So.2d 836, 843 (Ala.Cr.App. 1986), cert. denied, 502 So.2d 836 (Ala. 1987). Shadle v. State, 280 Ala. 379, 194 So.2d 538 (1967).
We find no abuse of discretion in the trial judge's refusing to grant the appellant's motion for a mistrial or a continuance on this basis.
 VI
The appellant's counsel maintains that the trial court erred when the prosecutor was allowed to impeach his own witness.
The issue concerns a point when Davenport, called as a witness by the State, was being questioned by the prosecutor and the following occurred:
 "Q. Now, do you remember talking to Sergeant White, Sergeant Gaskey?
"A. Yes, sir.
 "Q. And is what you told them back in May of 1986 the same thing you told us today?
"A. No, sir.
 "Q. Okay. What, if any, type differences are there?
"MR. McDONALD: We object to this.
"THE COURT: Overruled.
"MR. McDONALD: Impeaching one's own witness?
"THE COURT: Overruled.
"MR. McDONALD: We except.
"THE COURT: Yes, sir, I understand.
 "THE WITNESS: I didn't tell them about Archie burning my shirt and I didn't tell them about me seeing the wallet." (R. 585-586)
The appellant asserts that this constituted the prosecutor's impeaching his own witness.
Shepherd v. Southern Railway Company, 288 Ala. 50, 60,256 So.2d 883 (1970), states:
 " 'Impeaching testimony' is that designed to discredit a witness, or to reduce the effectiveness of his testimony by bringing forth evidence to show why faith should not be accorded his testimony. "Impeaching evidence is evidence designed to discredit a witness or to reduce the effectiveness of his testimony by attacking his character, motives, integrity or veracity."
Schroeder, Hoffman and Thigpen, Alabama Evidence, § 6-1 (1987).
Under this definition above of "impeachment", the question by the prosecutor was not designed to "discredit this witness" or "reduce the effectiveness of his testimony" and, therefore, the prosecutor was not impeaching his own witness.
Accordingly, the trial court did not err in overruling the objection to the prosecutor's bringing out these matters.
 VII
Section 13A-5-53, Code of Alabama (1981), requires this court to review the entire record for any errors adversely affecting this conviction and the propriety of this appellant's sentence of death by the trial court.
This court has reviewed the entire record in this cause as required by § 13A-5-53(a), *Page 116 
Code of Alabama (1981), and we have found no error adversely affecting the substantial rights of this appellant. Beck v.State, 396 So.2d 645 (Ala. 1980); A.R.A.P. 45.
The trial court found the existence of two aggravating circumstances:
(1) "The capital offense was committed while the defendant was engaged . . . in the commission of . . . robbery." (§13A-5-49(4)).
(2) "The capital offense was especially heinous, atrocious or cruel compared to other capital offenses." (§ 13A-5-49(8)) (R. 1184) — See Appendix A, hereto attached.
The first aggravating circumstance is fully supported by this record.
We are convinced that this capital offense was especially heinous, atrocious and cruel. Hubbard v. State, 500 So.2d 1204
(Ala.Cr.App.), aff'd, 500 So.2d 1231 (Ala. 1986), cert. denied,Hubbard v. Alabama, 480 U.S. 940, 107 S.Ct. 1591,94 L.Ed.2d 780 (1987). The victim was 59 years old at the time of his death, lived alone, was unsuspecting and unarmed when overpowered by his three assailants. There was a total of 78 stab wounds to the body, with 16 to the neck, 59 in the back and three to the face. A contusion to the back of the victim's head and several areas of abrasion were found on the victim's body. The most extensive injuries were to the neck where the carotid artery and jugular vein were severed. Dr. Brissie's opinion was that "all the wounds depicted were ante-mortem or prior to the decedent's death." (R. 1184) These facts support and sustain the finding of the second aggravating circumstance. See Thompson v. State, 503 So.2d 871, 882 (Ala.Cr.App. 1986), aff'd, 503 So.2d 887 (Ala. 1987), cert. denied, Thompson v.Alabama, ___ U.S. ___, 108 S.Ct. 204, 98 L.Ed.2d 155 (1987).
The trial court found no statutory mitigating circumstances. The trial judge went through each mitigating circumstance as listed in § 13A-5-51, Code of Alabama (1981).
The trial court considered the fine family of this appellant and the appellant's background and character. The trial judge's findings regarding the mitigating circumstances are supported by the record. See Appendix A.
We find no evidence in this record that the sentence was imposed under the influence of passion, prejudice or any other arbitrary fact. Hubbard, supra.
Our independent weighing of the mitigating circumstances and the aggravating circumstances convinces us that death was the proper sentence to be imposed in this cause.
Further, the sentence of death in this case is not disproportionate to the penalty imposed in similar cases considering the crime and this appellant. See Beck v. State,396 So.2d 645, 654, n. 5 (Ala. 1980) (a great majority of sentences in Alabama are for robbery/murder).
We have carefully searched the record for plain error and found none. Therefore, the appellant's judgment of conviction and sentence of death is proper. The same is due to be and is, hereby, affirmed.
AFFIRMED.
All the Judges concur.
BOWEN, P.J., concurs in result only.
 APPENDIX A
State of Alabama
vs
Gary Leon Brown
In the Tenth Judicial Circuit of
The State of Alabama
Criminal Division
Case No. CC86 03115
ORDER OF THE COURT ON
 IMPOSITION OF THE DEATH PENALTY
Defendant Brown was charged by indictment with the capital offense of murder during a robbery in the 1st°, 13A-5-40(2), *Page 117 
wherein one Jack David McGraw was intentionally killed.
A petit jury duly impaneled and sworn as required by law, after hearing the evidence, the court's charge as to the applicable law, including the lesser included offense of felony murder and manslaughter found the defendant guilty of capital murder.
The same jury, sequestered throughout the entire proceedings, heard evidence, counsel's argument and the court charge during the "punishment" phase and returned an advisory verdict affixing the defendant's punishment at death.
The vote was ten for death and two for life without parole, as reflected in the verdict form and confirmed by individually polling the jury.
This court commends the respective attorneys for putting aside any attempt to emotionally influence the jury with passion, prejudice or other arbitrary factors in arriving at their advisory verdict.
The trial record abundantly supports the court's finding that the jury's advisory verdict was not imposed under the influence of passion, prejudice or any arbitrary factor.
 FINDINGS OF FACT FROM THE TRIAL
The court makes the following findings of fact from the evidentiary portions of the guilt phase trial proceedings:
The thrust of the state's case against defendant Brown was bottomed on Brown's inculpatory statement(s), the testimony of Jimmy Davenport and Blanche Bankhead, the wife of co-defendant Archie Bankhead.
Brown's statements — The court admitted into evidence, over objection, defendant's three inculpatory statements.
The suppression hearing record will best evince the defendant's several objections to the admission of the defendant's statements.
The statements as a whole may be summarized thusly:
Defendant admits to a homosexual relationship with the deceased, the deceased paying money to Brown in exchange for Brown allowing the deceased to perform oral sex with Brown.
Brown states that he and his two co-defendants, Bankhead and Bynum, went to McGraw's trailer for the purpose of stealing his "money and some things."
At page 1 of his July 17, 1986 statement Brown states, ". . . . . James Bynum suggested that we go out to a man's house where we had been before and sit with him and drink with him and if he passed out take his uh, take his money and some things from his house and uh if he acted like he was mad that we were gonna knock him in the head and take his stuff uh so we, Jimmy didn't want a go and I made the statement that I didn't want a go because we had some money, you know, I told James that we, if we were gonna do that we should wait until some day when we didn't have any money but it was talked over and it was decided that we were gonna go out there anyway."
At page 2 defendant further states, ". . . . . but me and Archie and (inaudible) Bankhead and James Bynum went to the door because Jimmy was to stay in the car in case we needed to leave quickly or whatever, and the man invited us, we knocked on the door and the man invited us in and uh we walked in, all three of us walked in and he made the statement that he didn't want to party that night because he had to go to work in the morning, that we needed to leave. Jack McGraw said that he didn't want to party that night, that he had to go to work in the morning, that we needed to leave, so I opened the door and walked out and James walked out behind me and Archie behind him and Jack was behind all of us, uh, I started walking toward the car and James followed me and Archie was, of course, following James. Uh, when we got right outside the trailer, Archie turned around and grabbed Mr. McGraw around the neck and started hitting him in the face and I turned around and was observing this at the time and I'm sure that Jimmy that was out in the car was observing it too *Page 118 
and uh James hit the man in the face a few times while Archie still had him around the neck and uh they, Archie and the man fell in to the yard there about five feet from the entrance to the trailer and
At pages 3, 4 and 5 defendants states
 "Q. O.K., what happened after he was drug back in to the trailer?
 "A. After that, uh, somebody made the statement grab, grab some stuff, to get some stuff and at that time uh, I felt like the man was dead uh because of the choking and I assume that they did too uh. . . . .
"Q. Talking about when Archie choked him?
 "A. Right, when he, when he, after he got up from choking him I assumed that he was dead then, then, of course, like I said they grabbed him by the legs and drug him in to the trailer and I described where he was laying then. Uh, then as we started to grab some items the man made a noise, moaning noise. At that time, Archie grabbed his pocket knife and opened it up and handed it to me and said, "man, you got to kill him because he's gonna tell what we've done if you don't kill him", and I held out my hand and he handed me the pocket knife."
 "A. Uh, but anyway, I, Archie handed me the pocket knife and I stood there and held it for a few seconds and he made the statement again, "man, you got to kill him, he's gonna tell on us if you don't kill him", then he went to the kitchen and grabbed, picked something up which I understand now to be a skillet but at the time I was not sure I just knew that he had a fairly large object in his hand so he ran to the kitchen and when he was on the way, it's only about five feet but as he turned around and was headed back toward me with the, whatever the object was, the large object, I jumped down on top of the man and he made the statement again, "man you got to kill him now, you know, damn it, you got to make sure he's dead", so I saw him standing there with the object and so I myself was afraid of what was uh what might transpire, I can't even say that I knew he was gonna hit me with the object he had in his hand but I had a feeling from the look in his eyes that he was uh, you know, I don't even know how to put it but I, anyway, I was scared that he, I I was scared of the whole situation from what had transpired as to what as was supposed to transpire when we went out there uh, that I was in a situation where I didn't know what was gonna be done to who at that point so I stabbed the man with the pocket knife several times and I looked back up at Archie and he was still holding the, what we know now was the skillet and uh I stopped stabbing the man and looked up and he said, "man, you, that pocket knife ain't gonna get it, you got to stab him, you got to kill him or he's gonna tell on us" so I turned around and stabbed the man some more, well then, he came and hit the man over the head with the object, which we know now was the skillet. Uh, at that time I quit stabbing him again because I, well I'm saying because I knew but I I assumed that surely that he was dead but then he made the statement again "that pocket knife ain't gonna get it, you're gonna have to stab him" so at that time James said, "fuck that pocket knife, I'll get him" so he ran in to the kitchen and came back with a butcher knife and cut the man's throat and when I saw that happen I felt sure at that time that he was dead or was going to die so at that time I quit stabbing the man and got up and hended the, well at that point I'm not sure if I handed the pocket knife back to Archie or if I put it in my pocket. Uh, I really don't know cause things were happening so *Page 119 
fast, but at that time uh, Archie or James one made the statement, "get his stuff, we gotta get out of here" so I think I grabbed, I don't know what I grabbed but I grabbed an item from his house, carried it out to the car and I came back and James was washing either his hands or he was washing, the water, he was washing something in the kitchen sink. I don't know if it was the butcher knife, his hands or both or what and uh I grabbed, grabbed something else uh and started to pick it up, well Archie was getting the beer out of the refrigerator, so anyway, we took the remainder of his stuff and loaded it in the car and uh the car was too full of stuff and they was all in there and I couldn't fit in so I said, they wanted to rearrange the stuff where we could all get in and I said, "no, never mind that, just put me in the trunk" so they opened the trunk up and locked me in, you know, put me in the trunk and I rode back to Archie's house in the trunk and when we got there uh, they let me out of the trunk and we took the stuff in his house, which we later on took to another place to hide and I guess that about concludes what we got to say."
At Bankhead's house Brown states that he and his companions burned their bloody clothing, boiled the pocket knife that was used to kill Mr. McGraw and foisted off the stolen appliances on mutual unsuspecting friends.
Davenport — Jimmy Davenport, the driver, testified that en route to McGraw's trailer the three defendants discussed killing the deceased, defendant Brown inquiring of Bynum "can you knock this old man out?", Brown stating, "if you can't I can".
Further from Davenport, who stays inside the car but can see the trailer from his vantage point — the deceased allows Brown, Bankhead and Bynum into his home for a brief period but soon escorts them out; the deceased was attacked from behind by Bankhead; Bankhead grips McGraw's head in "headlock" or "half Nelson", defendants Brown Bynum begin pummeling the deceased in the face with their fists; the deceased falls to the ground.
Witness Davenport describes Brown as "in front, slashing at his neck;" the three defendants drag the prostrate body of the victim into the trailer.
One knows from Brown's statement quoted at length above that the defendants now begin to steal the defendant's housewares, monies, etc., and how the episode resulted in a knifing frenzy.
One knows from Brown's statement that having finished their butchery with respect to Mr. McGraw the assailants begin to load their vehicle with Mr. McGraw's personal items, filling their car so full of "boot" that Brown had to ride away loaded in the trunk of the vehicle.
Blanche Bankhead — was at home with her children when the three assailants arrived at the Bankhead home.
Mrs. Bankhead describes the defendant's carriage and speech moments after the murder — the defendants behaving at times in a jocular, cavalier manner. Mrs. Bankhead described Brown's bloody appearance and corroborates Brown's statement about burning the clothes and boiling the knife.
Technical people testified, coroner/medical examiner Robert Brissie, M.D. will be referenced below.
The defendant offered no testimony during the guilt phase (other than co-defendant Bankhead who invoked the Fifth Amendment).
 CONCLUSION
The undersigned concludes that the jury's guilty verdict is well supported by the evidence presented at trial, that it is virtually indisputable that Brown either intentionally killed the deceased during the course of a robbery or was a willing accomplice to the killing.
 PUNISHMENT PHASE AND FINAL SENTENCING HEARING
At the punishment phase of this trial before the same jury as outlined above, the *Page 120 
state was allowed to show aggravating circumstances and the defendant allowed to show mitigating circumstances.
Relative to aggravating circumstances the court finds that the state has proven beyond a reasonable doubt:
13A-5-49(4)
The capital offense was committed while the defendant was engaged. . . . . in the commission of a robbery.
The court, as previously stated, finds this aggravating circumstance to exist.
13A-5-49(8)
The capital offense was especially heinous, atrocious or cruel compared to other capital offense.
In addition to the factual findings above, the undersigned notes that the deceased was 59 years of age at his death, lived alone, was unarmed and unsuspecting of his assailants' foul purposes.
Dr. Robert Brissie, coroner/medical examiner, testified that the deceased received 16 incised wounds to the neck, 59 stab wounds in the back deep enough to allow probing, the deepest of which approximated 2.0 inches, three stab wounds to the face and an incised wound to the scalp were described by Dr. Brissie as well as extensive areas of abrasion and contusion consistent with the attack outside the mobile home.
The most extensive injuries observed by Dr. Brissie were to the neck, the carotid artery and jugular vein being severed. Dr. Brissie opined that the deceased was, in all probability, alive throughout the course of the homicidal acts — "all wounds depicted were anti mortem or prior to decedant's death."
The undersigned concludes that based on evidence and the applicable case law, this capital offense is in fact especially heinous, atrocious and cruel compared to other capital cases.
The court finds no other aggravating circumstances to exist.
Mitigating Circumstances
At the punishment phase before the jury, the defendant elicited from family members biographical data concerning the defendant and his character thru his adolescent years.
A school teacher in the county jail testified as to the defendant's skills in assisting prisoners with basic learning skills.
The jury was afforded the opportunity to independently assess the existence of each statutory mitigating circumstance referenced to 13A-5-51 (1 thru 7) plus the opportunity to find mitigation by way of 13A-5-52.
At the final sentencing hearing before the undersigned, a pre sentence report was submitted by Probation Services and admitted into evidence as were numerous letters from the defendant's family and friends supportive of a sentence of life without parole.
The defendant's family members, including mother, father, two sisters, a brother, neighbors, leaders of the Christian community that know the defendant's family all testified, supportive of a sentence of life without parole.
The court independently makes the following findings relative to mitigation:
§ 13A-5-51. Mitigating circumstances — Generally.
(1) The defendant has no significant history of prior criminal activity;
Does not apply. Out of the jury's hearing presence the defense conceded that this mitigating circumstance does not apply.
Defendant currently has a pending Robbery 1° (the capital offense for which defendant was convicted was committed while the defendant was on bond for Robbery).
Defendant has been previously been convicted of felony VUACSA and sentenced to two years in state prison, Shelby County case # 82422. Moreover, see pre sentence report re host of misdemeanor arrests and/or convictions.
(2) The capital offense was committed while the defendant was under the influence of extreme mental or emotional disturbance; *Page 121 
Does not apply. There is absolutely no evidence supportive of this circumstance. Defendant was housed at Taylor Hardin Secure Medical Facility from December 13, 1986 to January 30, 1987, pursuant to his plea of not guilty by reason of mental disease or defect (which was subsequently withdrawn).
The Lunacy Commission unanimously found no evidence of mental or emotional problems that would have contributed to the defendant's commission of the capital offense. The entire record from Taylor Hardin has been made part of the record in these proceedings.
There is no evidence of any prior mental or emotional disturbance for which defendant was treated by a professional.
(3) The victim was a participant in the defendant's conduct or consented to it;
Does not apply.
(4) The defendant was an accomplice in the capital offense committed by another person and his participation was relatively minor;
Does not apply. The evidence is to the contrary. Defendant Brown admitted inflicting the vast majority of stab wounds to the deceased.
Defendant Brown was integrally involved in the planning of the robbery. Defendant Brown was the best known assailant to the deceased, having engaged in homosexual acts with the deceased, having stayed overnight at the deceased's house on prior occasions.
(5) The defendant acted under duress or under the substantial domination of another person;
Not supported by the evidence. The court is mindful defendant Brown, at page 4 of his July 17, 1987, confession states that he was, in effect, afraid that co-defendant Bankhead would do him bodily harm if he didn't do as Bankhead told him.
Neither Brown's statement in this regard nor any other evidence adduced at any phase of this proceeding support the existence of this mitigating circumstance.
(6) The capacity of the defendant to appreciate the criminality of his conduct or to conform his conduct to the requirements of law was substantially impaired;
Does not apply. The undisputed evidence adduced at trial was that Brown had ingested beer and alcohol over the course of some hours preceding this killing.
Brown attributes his demonic behavior to drug abuse in his interviews with the medical people at Taylor Hardin.
Further, the same sentence report confirms Brown's long standing alcohol and substance abuse.
Based on the evidence adduced at trial including Brown's statements, the testimony of Jimmy Davenport and Blanche Bankhead the court finds that the savageries committed by the defendant are not mitigated by the defendant's ingestion of alcohol and or drugs on the day of the offense or by way of the defendant's long time substance abuse.
(7) The age of the defendant at the time of the crime.
Does not apply. Defendant was 27 at the time of the offense, date of birth July 14, 1958.
§ 13A-5-52. Same — Inclusion of defendant's character, record, etc.
I would be remiss if I did not comment on the defendant's very fine family — mother, father, sisters, brother — all of whom were in attendance at the jury proceedings accompanied by many supportive friends, neighbors and community leaders.
The profile I've sketched of Mr. Brown's family and the genuine sympathy I feel for them does not mitigate the punishment or serve as a basis for a sentence of life imprisonment without parole.
Defendant Brown's sentence is bottomed squarely on the balancing of aggravating and mitigating circumstances.
In conclusion, I hold that the aggravating circumstances discussed earlier weighted against the absence of mitigating circumstances compel the court to uphold the jury's advisory verdice affixing punishment at death. *Page 122 
DONE and ORDERED this the 27th day of March, 1987.
 /s/ James H. Hard James H. Hard, Circuit Judge